## Case No. 5,972.

### HAMBLETON v. HOME INS. CO.

[6 Biss. 91.] [1]

Circuit Court, N. D. Illinois.   May, 1874.

RENEWAL OF INSURANCE POLICY — AUTHORITY OF SOLICITOR—WAIVER, HOW SHOWN—WAIVER, WHAT CONSTITUTES.

..1. The insurance solicitor has no authority simply from the nature of his business, to bind the company to a waiver of payment of the premium.

2. Where by the terms of the policy a renewal is not binding unless the renewal premium be paid, the assured, claiming a waiver, must show either an express agreement to that effect or one arising by necessary implication from the facts and circumstances.

3. Where the partner of the agent of the assured tells the solicitor that if he will carry the risk and send him the bill, he will pay it, and the solicitor answers, "All right," and afterwards presents the bill at the agent's office, of which he has notice, but makes no effort to pay it, the whole transaction being neither reported to the regular agents of the company nor entered upon their books, there is no consummated contract of renewal, and no waiver of the payment of the premium.

[Cited in Connecticut Fire Ins. Co. v. Hamilton, 8 C. C. A. 121, 59 Fed. 265.]

This was a bill in equity [by Chalkley J. Hambleton against the Home Insurance Company of New York] to enforce an alleged verbal contract of renewal of a policy of insurance issued by the company on the second day of October, 1869, to indemnify the plaintiff for loss on buildings owned by complainant in Chicago, and destroyed by fire on the 9th of October, 1871. The original policy provided that neither it nor any renewal thereof should take effect until the premium was paid by the assured. The original policy was given for one year, and was renewed from time to time, up to October 2nd, 1871.

W. T. Burgess, for complainant.

Paddock & Ide, for defendant.

1. The testimony of the complainant's witnesses as to a contract to renew, is lacking in the certainty and clearness required by courts of equity in cases for specific performance, and, besides, is contradicted by Parsons, the solicitor of defendant, and Parsons is sustained by the circumstances, and by inferences resulting from the routine of the Chicago office. Neville v. Insurance Co., 19 Ohio, 452; Trustees of First Baptist Church v. Brooklyn F. Ins. Co., 28 N. Y. 161.

2. Parsons had no authority to bind the company, either by contract or waiver of conditions of the policy. Nor did the company

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

pany hold him out in their course of dealing as having such authority. Renewal is, in effect, a new contract. Winnesheik Ins. Co. v. Holzgrafe, 53 Ill. 524; Hartford Fire Ins. Co. v. Walsh, 54 Ill. 167.

3. No policy is delivered; the contract is incomplete. No credit was given, and no waiver of the condition requiring prepayment of premium. The policy made this a condition of renewal. Flint v. Ohio Ins. Co., 8 Ohio, 501.

DRUMMOND, Circuit Judge. It is claimed on the part of the plaintiff that this policy was renewed for another year from October, 2nd, 1871. The facts seem to be that Mr. Dunning. of the firm of Dunning & Easton, was the plaintiff's agent for the property, the subject of the insurance.

Mr. Parsons, the renewal solicitor of the defendant. in September or October, 1871, called at the office of Dunning & Easton, but did not find Mr. Dunning in, and left without stating his business. The second time, he was asked by Easton what his business was, and he stated that it related to the insurance of the plaintiff. Mr. Easton told him that Dunning was absent in Michigan, and that if he would carry the risk and send him the bill, he would pay him the premium. Parsons said that this was "all right." This is the statement made by Mr. Easton.

The premium for the renewal was never in point of fact paid, for the reason, as Easton says, that the bill was never presented. Easton and another witness state that Parsons had a memorandum book with him, in which he appeared to make an entry at the time this conversation took place. There does not seem to be much doubt but that these witnesses understood that Parsons had agreed to renew the insurance.

There is a conflict in the evidence as to the time when this conversation took place. According to Mr. Easton, it was about the 2nd day of October, 1871. According to Mr. Parsons, it was the latter part of September of that year. Mr. Easton states that on the return of Mr. Dunning, he told him what had taken place between himself and Mr. Parsons, and Dunning said that he was glad of it, and that it was his purpose to attend to it. Mr. Easton also says that he heard that Parsons afterwards had returned with a bill when he was not in his office. There is some conflict in the evidence as to the number of times that Parsons called at the office of Dunning & Easton. Some of the witnesses say it was three times, others that it was only twice.

Mr. Parsons says that at the second time when he called, something was said about the policy being renewed; that there was nothing definite done; that he made a memorandum in the book which he had, to the effect that he was to call and see Dunning when he returned; that Easton did not seem to have the right to order the insurance, and that he would not be responsible for the pre-

mium if the plaintiff did not want the insurance.

Both Mr. Parsons and several of the officers of the company state that the practice was, whenever the solicitor of the renewals made his returns, to place on a file, called the "binding file," a note of the facts in such manner as to indicate that the contract was binding on the company. It is clearly shown that nothing of this kind was done by Parsons, and that there was no entry or memorandum of any kind made upon the books or papers of the company, and there is nothing except what took place with Parsons to affect the company as to the renewal of this policy. The memorandum book Parsons had in his hand at the time was destroyed by the fire.

When Parsons was spoken to after the destruction of the property, concerning the renewal of the policy, he did not seem to be perfectly certain upon the subject, though the impression on his mind was that the policy was not renewed. He made an effort to recollect all the policies that were renewed, as he says, but could not remember that this particular one was renewed. After the property was destroyed the plaintiff tendered the amount of the premium to the officers of the company, by whom it was refused.

There are two questions arising upon this state of facts. One is whether there is any satisfactory evidence to show that Parsons was authorized to waive the payment of the premium, and to bind the company by giving credit on the same.

Parsons seems to have been simply a sort of clerk or agent, employed to solicit policies and renewals, and without any authority to bind the company, except such as might arise from the nature of his employment. If even the question were to rest on the right of Parsons to bind the company by waiver of the premium, there is great reason for saying that there was no sufficient evidence shown to authorize him to bind the company.

But, secondly, I am of the opinion that, conceding his authority, there was no agreement by the company by which there could be said to be a waiver of the payment of the premium for the renewal due on the second of October, 1871.

If by the terms of a policy it is distinctly stated that it shall not be renewed except on the payment of the premium, it should then clearly appear before that condition can be said to be waived, that there was either an express agreement to that effect, or one arising by necessary implication from the facts and circumstances of the case.

It is a very common practice for insurance companies to waive the payment of the premium where its payment is a condition precedent to the existence of a policy, and to the continuance of it by renewal; and where it really appears that this has been done, either by facts expressly shown, or by necessary implication, the courts will enforce the obligations of the policy against the under-writer. But where this condition is annexed by express terms it is manifest that the only safe rule upon which reliance can be placed is to require the assured to furnish proof, clearly showing that the payment of the premium at the time was waived by the understanding or agreement between the parties; and it must appear that such was the understanding of both parties. It is not enough for the assured to understand the payment of the premium to be waived: the underwriter must also have so understood. In other words the minds of the parties must meet upon the subject matter of the waiver of the payment of the premium. Undoubtedly this may be done by circumstances. Express words need not be used, but the circumstances must clearly show the understanding of the parties.

Now it was in this case incumbent upon the plaintiff to make out this waiver. He must show that the company agreed to waive the payment of the premium on the second day of October, 1871. It is not shown that Mr. Parsons or the company, or any of its authorized agents did make that agreement either in words or by necessary implication, and where an agreement is sought to be made out by such testimony as is here introduced, it is manifest that great stress should be placed upon the conduct of the parties at the time, because that may be decisive of the case.

It is said that Parsons, in reply to what was stated by Easton, declared that it was all right. That was an equivocal expression. It might be that he understood that the plaintiff intended to renew his insurance. It does not necessarily imply that he understood the company were at that time bound to extend credit upon the payment of the premium from the second of October, and the entry made by him in his memorandum book confirms this.

Again, it is said by Mr. Easton that he notified Mr. Dunning of what had taken place between him and Mr. Parsons, and that he (Easton) was told that Parsons had called with a bill. Admitting the full effect of what is stated by Mr. Easton, was it the intention that Parsons was to call absolutely any number of times to obtain payment of this bill? Or, rather, was it not incumbent on Dunning or on Easton, if Parsons had called for the premium and it was not paid him, to make some inquiry on the subject, and not permit the premium to be in default on the day when it should have been paid? Or, ought they to be permitted to take the chances upon so material a point?

If the company is to be bound in the case, it must be by the loose conversations and actions of a renewal solicitor without its knowledge, and of which it had no notice, and when there was nothing upon its books to show that a contract was made by it.

It seems to me that under the circumstances of this case the omission of Parsons to give the officers of the company any notice,

the fact that no memorandum was placed on any of the books or papers of the company to indicate that there was a renewal, or that there was a credit given upon the premium, is confirmation strong that no one on the part of the company understood that an agreement had been made to waive the payment. The bill will therefore be dismissed.

NOTE. To support an action against an insurance company to compel it to issue a policy upon an alleged contract of insurance, such contract must be clearly proved. If the matter is left in doubt the suit must be dismissed. Neville v. Merchants' & M. Mut. Ins. Co., 19 Ohio, 452; 2 Pars. Cont. 351. The plaintiff, before he is entitled to receive payment or to sue for the loss, must present the notice and statements required by the company's policies. Ang. Ins. § 226; Columbian Ins. Co. v. Lawrence, 2 Pet. [27 U. S.] 53, 10 Pet. [35 U. S.] 513; Haff v. Marine Ins. Co., 4 Johns. 132. In a recent case in the Illinois supreme court,—Lycoming Fire Ins. Co. v. Rubin [79 Ill. 402],—it was held that an insurance solicitor could not bind the company to a waiver of the conditions of the policy, and that he was the agent of the insured and not of the company.